Filed 4/7/25  P. v. Tatum CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>IRVIN TERRELL TATUM,<br><br>    Defendant and Appellant. | A169039<br><br>(Marin County<br>Super. Ct. No. SC010852A) |

Defendant Irvin Terrell Tatum led a botched carjacking during which his accomplice shot and killed a young boy.  A jury found Tatum guilty of first degree murder under a felony-murder theory, finding he was a major participant in the underlying crime and acted with reckless indifference to human life (Penal Code § 189),[1] and the trial court sentenced Tatum to serve 36 years to life in prison.  Tatum filed a petition for resentencing, arguing no evidence established the requisite mental state.  The trial court found beyond a reasonable doubt that Tatum had acted with reckless indifference to human life and denied the petition.  We affirm.

---

    [1] Further statutory references are to the Penal Code, unless otherwise indicated.

# BACKGROUND

## A. *The Prior Shooting*

In 1988, 19-year-old Tatum and 17-year-old Terrence Harper "were like brothers" who regularly hung out. In May of that year, Tatum was the target of a shooting, and he believed a woman whom he had met prior to the shooting had set him up. The next day, "in retaliation" for this perceived betrayal, Tatum along with Harper and some other friends shot at the woman's house while several people were inside.

## B. *The Attempted Carjacking and Killing*

One month later, Tatum and Harper spent a day driving around, drinking alcohol, smoking marijuana, and flirting with girls. Tatum owned a Mercedes Benz which "needed some engine work," so he "suggested to" Harper they steal a different one and change the license plates. Tatum armed himself for the planned carjacking, and he facilitated getting a gun for Harper too.

That night, L.T. was driving home in a Mercedes.[2] L.T.'s adult daughter, C.A., sat in the front passenger seat with one of L.T.'s granddaughters in her lap. In the back seat sat another granddaughter, a niece, and two great-nephews, including four-year-old D.R.

At a stoplight in Oakland, Tatum pulled up alongside L.T. and decided her Mercedes was the target. This prompted pushback from Harper, who assumed they would target a parked, unoccupied vehicle. Tatum berated Harper, stating he should have brought someone else to help steal a car. Tatum further promised he would give Harper a car if he helped steal the Mercedes.

---

[2] Pursuant to California Rules of Court, rule 8.90, governing "Privacy in opinions," we anonymize the names of the victim and witnesses.

Tatum then backed up to pull into the same lane as L.T. and followed her onto the freeway. As he tailed L.T., Tatum flashed his lights "in attempt to have [L.T.] pull over"; L.T. sped on, and Tatum followed her toward the Richmond-San Rafael Bridge. L.T. lost sight of Tatum's car by the time she reached the bridge's toll plaza, so L.T. proceeded onto the bridge without notifying the toll attendant about the incident.

On the bridge, Tatum's car reappeared, prompting L.T. to speed up to "probably . . . between 75 and 80" miles per hour. C.A. told the children to unbuckle their seatbelts and get down on the floor. L.T. tried to take an exit at the end of the bridge, but Tatum accelerated past her, cut in front of her path, and stopped. L.T. "slammed on the brakes" to avoid a collision and came to a stop in the shoulder.

Tatum ordered Harper to " 'get' " the car. Harper, who had been "blanking out" during the ride due to intoxication and who was armed with the gun and ammunition that Tatum had procured, then exited Tatum's vehicle and walked toward L.T.'s car, gun in hand.

L.T. and C.A. struggled to get the car in reverse as Harper approached. As they recalled, as soon as Harper reached the car, he shot at them four or five times before L.T. got the car in gear. By contrast, Harper recalled that he heard the "wheels screech[] and [he] panicked and wounded up shooting into their car."

L.T. managed to drive around Tatum's vehicle and took off, driving through red lights and honking to get other drivers' attention. L.T.'s niece informed L.T. and C.A. that she thought D.R. was dead.

Meanwhile, Harper returned to Tatum's vehicle and could tell Tatum was "mad" at him for shooting the Mercedes. Tatum asked Harper why he shot the car, but Harper was too intoxicated to respond.

3

Nonetheless, Tatum resumed their pursuit. L.T. had decided to drive to a California Highway Patrol station, but Tatum caught up to her as she took an exit off the highway, and he was again able to accelerate past L.T. and force her to a stop. Once again, Harper got out armed and approached the Mercedes. L.T. threw her vehicle into reverse but lost control, crashing into the off-ramp wall. With the target vehicle wrecked, Harper walked back to Tatum's car, and they drove off.

The next day, D.R. died due to a gunshot wound.

## C.    *Sentencing and Petition for Resentencing*

In 1989, a jury found Tatum guilty of first degree murder (§ 187), attempted robbery (§§ 211, 664), six counts of assault with a firearm (§ 245, subd. (a)(2)) and shooting at an occupied motor vehicle (§ 246) and found true the allegation that the principal was armed with a firearm in the commission of the offenses (§ 12022, subd. (a)). The trial court sentenced Tatum to serve 36 years to life in prison.

In 2019, Tatum filed a petition for resentencing under former section 1170.95.[3] He alleged he was "convicted of 1st or 2nd degree murder pursuant to the felony murder rule or the natural and probable consequences doctrine," and he alleged he "could not now be convicted of 1st or 2nd degree murder because of changes made to Penal Code § § 188 and 189, effective January 1, 2019." He further alleged that he was not the actual killer, did not have the intent to kill, and either was not a major participant in the felony "or" did not act with reckless indifference to human life. The prosecutor stipulated

---

[3] The Legislature later renumbered the provision without substantive change, effective June 30, 2022. (Stats 2022, ch. 58, § 10.) Unless otherwise noted, citations in this opinion are to the current version of the provision as codified in section 1172.6.

Tatum had made a prima facie showing for relief. The court issued an order to show cause.

Following briefing, the trial court held an evidentiary hearing. In addition to documentary evidence and witness testimony, Tatum called Dr. Laeeq Evered, a clinical psychologist and neuropsychologist, to testify as an expert in adolescent brain development to support Tatum's contention that his youth at the time of the offense was a significant factor in determining whether he acted with reckless indifference to human life. Dr. Evered opined that the areas of the brain involved in executive functioning — i.e., planning, problem solving, judgment and impulse control — are not fully developed in adolescents, including 19-year-olds. Dr. Evered also opined that childhood trauma and substance abuse further impact how adolescents process information, respond to situations, and make decisions. He then applied these general principles to the instant case, opining, for instance, that being involved in a carjacking "would potentially be very stressful for all parties."

Following additional post-hearing briefing and another hearing the court denied Tatum's petition, finding beyond a reasonable doubt that Tatum was a major participant who acted with reckless indifference to human life.

Tatum appeals.

**DISCUSSION**

A. *Legal Framework*

Effective in 2019, the Legislature narrowed the scope of the felony-murder rule and created a path to relief for defendants previously convicted of murder on a felony-murder theory that would fail to satisfy the new law. (*People v. Strong* (2022) 13 Cal.5th 698, 703; see Sen. Bill No. 1437 (2017–2018 Reg. Sess.).) "Resentencing is available under the new law if the defendant neither killed nor intended to kill and was not 'a major participant

5

in the underlying felony [who] acted with reckless indifference to human life . . . .' " (*People v. Strong*, at p. 703.)

As a form of mens rea, recklessness has a subjective element — i.e., "the defendant's conscious disregard of risks known to him or her" — and an objective element — i.e., "what 'a law-abiding person would observe in the actor's situation.' " (*People v. Clark* (2016) 63 Cal.4th 522, 616–617 (*Clark*).) The fact finder, therefore, is " 'asked to measure the substantiality and unjustifiability of the risk by asking whether its disregard, given the actor's perceptions, involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' " (*Id.* at p. 617.)

But knowing participation in an armed robbery is not sufficient, on its own, to demonstrate the requisite reckless indifference to human life. (*Clark*, *supra*, 63 Cal.4th at pp. 617–618; see *People v. Banks* (2015) 61 Cal.4th 788, 808 (*Banks*) ["the fact a participant in an armed robbery could anticipate lethal force might be used" is insufficient].) Reckless indifference to human life "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, at p. 617.)

*Clark* listed several, relevant factors in determining whether the defendant possessed this mental state: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?"

6

(*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*) [summarizing the *Clark* factors].) " '[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, *supra*, 63 Cal.4th at p. 618, quoting *Banks*, *supra*, 61 Cal.4th at p. 803.) The inquiry turns on the totality of the circumstances. (*Scoggins*, at p. 677.)

In most cases, as here, where a petitioner states a prima facie case for relief, the trial court must hold an evidentiary hearing at which the prosecution bears the burden of proving, "beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder" under the new law. (§ 1172.6, subd. (d)(3).) The court sits as the fact finder at the evidentiary hearing. (*People v. Oliver* (2023) 90 Cal.App.5th 466, 480 (*Oliver*).) In that role, " 'the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard.' " (*Ibid.*; see § 1172.6, subd. (d)(3) ["A finding that there is substantial evidence to support a conviction for murder . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing"].)

When reviewing a challenge to the sufficiency of the evidence, "we must examine the record independently for ' "substantial evidence — that is, evidence which is reasonable, credible, and of solid value" ' that would support a finding beyond a reasonable doubt." (*Banks*, *supra*, 61 Cal.4th at p. 804.) Viewing such evidence "in the light most favorable to the prosecution," we must ask whether " ' "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*Ibid.*; *Clark*, *supra*, 63 Cal.4th at p. 610.)

7

**B.**    *Analysis*

Tatum contends the trial court erred in denying his resentencing petition based on the finding that he acted with reckless indifference to human life. Specifically, he asserts that the evidence does not support the reckless indifference finding in view of the *Clark* factors or his youth at the time of the offense. Considering the totality of the circumstances and viewing the record in the light most favorable to the prosecution, we conclude a rational trier of fact could have found, beyond a reasonable doubt, that Tatum possessed the requisite state of mind at the time of the offense.

**1.  *Clark* Factors**

While our inquiry is based on the totality of the circumstances, we are guided by the *Clark* factors. Thus, we address each in turn.

**Knowledge, Use, and Number of Weapons.** While "a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life" (*Clark*, *supra*, 63 Cal.4th at p. 618), a defendant's decision to arm himself or his complicity in arming the actual killer tends to increase the defendant's culpability. (See *Tison v. Arizona* (1987) 481 U.S. 137, 145 ["Petitioner, actively participated in the events leading to death by, *inter alia,* providing the murder weapons"]; *Scoggins*, *supra*, 9 Cal.5th at pp. 677–678 ["Scoggins planned for the assault . . . to be unarmed" and therefore "was less culpable than the defendant in *Clark*, who expected his accomplice to use an unloaded gun to carry out the robbery"]; *In re Moore* (2021) 68 Cal.App.5th 434, 452 [first factor tended to show lack of requisite mental state because "Moore did not use a gun himself, and there was no evidence he supplied the gun"] *People v. Ramirez* (2021) 71 Cal.App.5th 970, 988 [same].)

Here, while Tatum did not use a gun during the commission of the offense, he armed himself with one for the purpose of committing the carjacking. Tatum also procured a gun and ammunition for Harper. This distinguishes the instant case from *People v. Underwood* (2024) 99 Cal.App.5th 303, 317–318, where the unarmed defendant did not know his accomplice had a knife until the robbery was in motion.

Moreover, Tatum "scolded" Harper for his apprehension about carjacking an occupied vehicle, further evidencing Tatum's conscious disregard of the increased risk that Harper would encounter resistance and may meet that resistance with lethal force. (See *Banks*, *supra*, 61 Cal.4th at p. 811.) The trial court accordingly found the first factor "pretty significant." We agree with this assessment.

**Presence at Crime and Opportunities to Restrain.** Our high court explained that a defendant's ability to " 'observe his cohorts' " tends to show " 'he shared in their actions and mental state,' " and his failure " 'to act as a restraining influence' " makes him " 'arguably more at fault for the resulting murders.' " (*Clark*, *supra*, 63 Cal.4th at p. 619.) Accordingly, "[p]roximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force." (*Ibid.*)

In the instant case, Tatum was not only present when Harper fatally shot D.R., he had a front-row seat to Harper's demeanor throughout their high-speed chase. As mentioned above, Tatum pressured and cajoled Harper — who was "blanking out" due to inebriation — to carjack an occupied vehicle. Tatum was not merely Harper's getaway driver (cf. *Banks*, *supra*,

9

61 Cal.4th at p. 805 [evidence insufficient where defendant was "no more than a getaway driver"]), Tatum chased down the target that he chose for Harper and then trapped the occupants to allow for the armed Harper to forcibly take their car, twice. Each of these actions — arming Harper, targeting an occupied vehicle, chasing that vehicle with an opportunity to observe Harper, and entrapping the car's occupants — suggest greater culpability pursuant to the second factor.

Tatum did not attempt to restrain his inebriated accomplice either. We agree with Tatum that there was little time for him to intervene once Harper exited the vehicle, but Tatum ordered Harper to " '[g]et out' " of the car and to " 'get' " the Mercedes without any limiting instruction. Considering that Harper was impaired and armed with a gun procured by Tatum, this factor corroborates a reckless indifference to human life.

**Duration of Restraint.** An offense of "substantial duration," especially one with a prolonged period of restraint of the victims, creates " 'a greater window of opportunity for violence' " and therefore is a consideration in the recklessness inquiry. (*Clark*, *supra*, 63 Cal.4th at p. 620.) Here, the trial court found there "was not a long period of restraint at the time the shooting happened." The court further found, however, that this mitigating fact was somewhat offset by the fact that, after the shooting, Tatum did not move his car to allow L.T. to escape.

We observe, however, that Harper may not have fired a shot until L.T. began to reverse her vehicle, giving Tatum little-to-no time to react by allowing L.T. to escape after the shooting began. Thus, this factor does not speak strongly to Tatum's state of mind one way or the other. (*Scoggins*, *supra*, 9 Cal.5th at p. 679 ["when different inferences may be drawn from the

circumstances, the defendant's actions after the shooting may not be very probative of his mental state"].)

**Knowledge of Accomplice's Likelihood of Killing.** A defendant's knowledge of an accomplice's likelihood of using lethal force is "significant" to the analysis of the defendant's mental state. (*Clark*, *supra*, 63 Cal.4th at p. 621; but cf. *Scoggins*, *supra*, 9 Cal.5th at pp. 681–682 [knowledge of accomplice's violent tendencies not sufficient to establish reckless indifference where defendant "planned an *unarmed* robbery and assault"].) A defendant may be put on notice of an accomplice's dangerous predisposition before the felony or during its commission. (*Clark*, at p. 621; *Scoggins*, at p. 681.)

Tatum knew Harper was willing to commit lethal force on his behalf. Indeed, it was only one month prior to D.R.'s murder that Tatum enlisted Harper to shoot at a woman's home as an act of retaliation. No one was apparently hurt in that incident, making the instant facts distinct from circumstances where a defendant arms a convicted murderer. (E.g., *Tison v. Arizona*, *supra*, 481 U.S. at p. 151.) Nonetheless, Tatum's awareness that Harper was willing to shoot at others suggests greater culpability than in the absence of such awareness.

Moreover, Harper's likelihood of killing an occupant in the Mercedes was reified when he shot into it four or five times. Tatum's willingness to continue the armed carjacking with Harper *after* the shooting "give[s] rise to the inference that the defendant disregarded a 'grave risk of death' " *before* the shooting. (*Clark*, *supra*, 63 Cal.4th at p. 621.)

**Efforts to Minimize the Risks of Violence.** This fifth factor overlaps with the second (opportunities to restrain) but with an emphasis on whether the defendant, in planning the crime, tried to minimize potential

11

violence. (See *Clark*, *supra*, 63 Cal.4th at p. 623 ["relevant to his culpability as planner, there is evidence that defendant planned the crime with an eye to minimizing the possibilities for violence"]; *Scoggins*, *supra*, 9 Cal.5th at p. 682 ["Scoggins planned an *unarmed* robbery" and "[t]he record does not show that Scoggins knew his accomplices were likely to deviate from the plan and use lethal force"].)

Here, there is no evidence that Tatum tried to minimize violence in the commission of the crime, just the opposite. To recap: he planned to commit a carjacking; he armed himself and Harper for that purpose; he made sure the guns were loaded despite knowing Harper had been willing to shoot at others before; he rejected Harper's suggestion they steal a parked car; he chased and trapped L.T. to allow Harper to steal her car; he then continued to pursue and trap her in the same manner even after Harper had shot into the Mercedes. Taken as a whole, Tatum's plan and execution evidence a disregard for the grave risk of death.

There is some evidence that Tatum was upset at Harper for shooting into the Mercedes, but it is ambiguous whether this reveals remorse about the use of lethal force or anger about damage to his desired plunder. (Cf. *Clark*, *supra*, 63 Cal.4th at p. 620 [fleeing "can be interpreted either as defendant's rejection of [accomplice's] actions in committing the shooting or as defendant's desire to flee the scene as quickly as possible, without regard for [the welfare of others]"].) We also observe that there is no evidence that Tatum knew D.R. had been shot or even that there were people cowering in the Mercedes' back row. For this reason, we do not place much weight on Tatum's decision to flee without rendering aid or his nonchalant conduct in the hours after the shooting.

In any event, the possibility that someone had been shot never deterred Tatum from his plan. He only gave up when the Mercedes was "wrecked." As the trial court stated, "Harper's shooting did not do anything in terms of alerting Mr. Tatum that he should abandon [his] plans." Like the court, we find that this "educates . . . as to what his intent was the entire time because there was no change in his conduct."

In sum, application of the *Clark* factors to the instant facts provided sufficient evidence for the trial court to conclude beyond a reasonable doubt that Tatum acted with reckless disregard for human life in the course of the carjacking that resulted in D.R.'s murder.

### 2. Tatum's Youth

Tatum also contends his youth at the time of the offense is a factor that refutes or reduces his culpability and precluded him from acting with the requisite mental state. Again, we disagree.

"[A] defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life. Indeed, the 'hallmark features' of youth — 'among them, immaturity, impetuosity, and failure to appreciate risks and consequences' — are arguably more germane to a juvenile's mental state than to his or her conduct." (*In re Moore, supra,* 68 Cal.App.5th at p. 454.) Age is not dispositive; it is merely a proxy for maturity. (*Oliver, supra,* 90 Cal.App.5th at p. 490) "The cases discussing the role of youth in relation to criminal culpability 'stress two areas': youthful offenders' 'relative impulsivity' and 'their vulnerability to peer pressure.' " (*People v. Pittman* (2023) 96 Cal.App.5th 400, 418 [remanding for trial court to consider whether defendant's youth impacted his ability to form the requisite mental state for second-degree murder].)

13

Here, the trial court assessed whether Tatum's conduct was motivated by either peer pressure or relative impetuousness on account of his immaturity. The court found Tatum was "not subject to peer pressure" and "not affected by his youthful brain in terms of his impulsivity." Its conclusion was reasonable.

No evidence shows, nor does Tatum allege, that he acted due to peer pressure. Indeed, Tatum admitted that he "manipulated" Harper to commit the crime with him. Nor does Tatum present evidence that he was "swept up in circumstances beyond his or her control that led to an unintended death." (*Oliver*, *supra*, 90 Cal.App.5th at p. 489.) Rather, he makes a general observation that "[t]eenagers have decreased impulse control. They are poor at assessing risks. They are more likely to respond in an emotional way instead of a conscious, rational way." We acknowledge this. We also observe Tatum's statements during his parole hearing, in which he described himself as " 'hyperactive as a kid' " who had undiagnosed " 'ADHD.' " But he also stated that " '[he] had the advantage over people [his] age, a financial advantage' " due to money he inherited after his mother died. And he attributed his criminal history to his " 'greed and impulsivity' " and " 'think[ing] [he] could get away with it.' "

Tatum makes no effort to show that the " ' "hallmark features of youth" ' may have been at play" when he committed the offense. (*People v. Pittman*, supra, 96 Cal.App.5th at p. 418.) Thus, his reliance on *People v. Ramirez*, *supra*, 71 Cal.App.5th at p. 991, where evidence supported a finding that the 15-year-old defendant was influenced by peer pressure, including fear of being killed by his older accomplices if he did not participate in the carjacking, is unavailing.

14

Reviewing the record ourselves, we find a rational factfinder could conclude beyond a reasonable doubt that Tatum's youth did not render him unable to appreciate the risk of death posed by his criminal activities. First, the decision to commit the carjacking was not the result of " 'a transient rashness,' " it was Tatum's premeditated plan. (*Oliver*, *supra*, 90 Cal.App.5th at p. 490.) Second, he procured guns for the purpose of committing the crime with "victims" in mind. We do not construe Tatum's own statements to mean he intended anyone to be killed or hurt, but he contemplated that the victims of his planned crime may resist or, at least, that he would need the threat of force against his victims. Third, not only did he plan for Harper and himself to be armed, he rebuked Harper for suggesting they steal a parked car. We find this fact to be significant because it demonstrates that he *intended* to cause an *armed confrontation*. Such an intent is at variance with a conclusion that Tatum's lack of " ' "experience, perspective, and judgment" ' " clouded his subjective awareness of the grave risk of death. (*In re Moore*, *supra*, 68 Cal.App.5th at p. 454.) A reasonable factfinder could therefore conclude that Tatum, despite his youth, was " 'subjectively aware that his actions created a graver risk of death than any other armed robbery.' " (*Oliver*, at p. 489.)

## DISPOSITION

The judgment is affirmed.

SIMONDS, J.*

WE CONCUR:

BROWN, P. J.

STREETER, J.

---

* Judge of the Superior Court of California, County of Sonoma, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15